JUDGE GARDEPIE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 5369

------------------------------------------------------------- x

NATIONAL BASKETBALL ASSOCIATION,
ATLANTA HAWKS, LP, BANNER SEVENTEEN
LLC, BOBCATS BASKETBALL, LLC, CHICAGO
PROFESSIONAL SPORTS LIMITED PARTNERSHIP,
CAVALIERS OPERATING COMPANY, LLC,
DALLAS BASKETBALL LIMITED, THE DENVER
NUGGETS LIMITED PARTNERSHIP, DETROIT
PISTONS BASKETBALL COMPANY, GOLDEN
STATE WARRIORS, LLC, ROCKET BALL, LTD.,
PACERS BASKETBALL LLC, LAC BASKETBALL
CLUB, INC., THE LOS ANGELES LAKERS, INC.,
HOOPS, L.P., MIAMI HEAT LIMITED
PARTNERSHIP, MILWAUKEE BUCKS, INC.,
MINNESOTA TIMBERWOLVES BASKETBALL
LIMITED PARTNERSHIP, NEW JERSEY
BASKETBALL, LLC, NEW ORLEANS HORNETS
NBA LIMITED PARTNERSHIP, MADISON SQUARE
GARDEN, L.P., THE PROFESSIONAL
BASKETBALL CLUB, LLC, ORLANDO MAGIC,
LTD., PHILADELPHIA 76ERS L.P., SUNS LEGACY
PARTNERS, L.L.C., TRAIL BLAZERS, INC.,
SACRAMENTO KINGS LIMITED PARTNERSHIP,
LP, SAN ANTONIO SPURS, L.L.C., MAPLE LEAF
SPORTS & ENTERTAINMENT LTD., JAZZ
BASKETBALL INVESTORS, INC., and
WASHINGTON BULLETS, L.P.,

               Plaintiffs,

    vs.

NATIONAL BASKETBALL PLAYERS
ASSOCIATION, DEREK FISHER, KEYON
DOOLING, JAMES JONES, MATT BONNER,
MAURICE EVANS, ROGER MASON, JR., CHRIS
PAUL, THEO RATLIFF, ETAN THOMAS, AMAR'E
STOUDEMIRE, MIKE DUNLEAVY, JAMES
FREDETTE, CHARLES JENKINS, and all those
similarly situated,

               Defendants.

------------------------------------------------------------- x

**CLASS ACTION
COMPLAINT FOR
DECLARATORY RELIEF**

____ Civ. _____ (____)



Plaintiffs, the National Basketball Association and its member teams (collectively, the "NBA"), bring this Complaint against defendants, the National Basketball Players Association (the "NBPA" or the "Union"), the individual defendants, and the defendant class (collectively, the "Defendants"), and allege upon personal knowledge with respect to themselves and their own acts, and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

1.    This action arises from the Union's threatened use of antitrust litigation to extract more favorable terms and conditions of employment in ongoing collective bargaining negotiations with the NBA.  The Union has repeatedly asserted that, unless it gets its way at the bargaining table, it will purport to renounce or "disclaim interest" in its role as the exclusive bargaining representative of NBA players, an impermissible bargaining tactic it mistakenly believes would enable it to commence an antitrust lawsuit challenging the legality of the NBA's ongoing lockout of NBA players and thereby to pressure the NBA to accede to the Union's preferred outcome in collective bargaining.  The Union's improper threats of antitrust litigation are having a direct, immediate and harmful effect upon the ability of the parties to negotiate a new collective bargaining agreement.  The NBA therefore seeks a declaration that the NBA's ongoing lockout, which is lawful as a matter of federal labor law, does not violate the antitrust laws.

## NATURE OF THE ACTION

2.    This action involves a dispute over the lawfulness of the NBA's exercise of its federally protected labor law right to lock out NBA players in support of the league's bargaining proposals made in the course of collective bargaining negotiations between the NBA and the Union.

3.     The NBA and the Union have had a continuous collective bargaining relationship for more than 40 years, and during that period have entered into numerous collective bargaining agreements, the most recent of which covered the period from July 29, 2005 through June 30, 2011 (the "CBA"). To date, the parties have been unsuccessful in negotiating a successor agreement to the CBA. When the CBA expired on June 30, 2011, the NBA exercised its right to lock out the NBA players.

4.     In the course of the negotiations over a new collective bargaining agreement, the Union has threatened on more than two dozen occasions to abandon or renounce (to "disclaim interest" in) its role as the exclusive bargaining representative of NBA players. The Union has threatened to pursue this course not because it is defunct or otherwise incapable of representing NBA players for purposes of collective bargaining, and not because NBA players are dissatisfied with the representation they have been provided by the NBPA or no longer wish to engage in concerted activities in negotiating the terms and conditions of their employment. To the contrary, the NBPA's threatened "disclaimer" is nothing more than an impermissible negotiating tactic, which the Union incorrectly believes would enable it to commence an antitrust challenge to the NBA's lockout, which the Union in turn believes would strengthen its position in negotiations over a renewed labor agreement.

5.     Whatever the NBPA may choose to call itself after its purported disclaimer – such as a "trade association" – it will remain a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5), and thus, the Union's threatened disclaimer is not intended as a good faith, permanent relinquishment of the right to bargain with the NBA concerning the terms and conditions of employment of NBA players. It instead is

designed only to misuse the antitrust laws in an effort to secure more favorable collective terms and conditions of employment and to deny the NBA its right to engage in a lawful lockout.

6.      In reaction to the NBPA's conduct, the NBA is commencing a proceeding before Region 2 of the National Labor Relations Board (the "NLRB" or "Board") by filing an unfair labor practice charge alleging, among other things, that any purported disclaimer by the Union would be ineffective and a violation of federal labor law – a matter within the primary jurisdiction of the NLRB.

7.      Defendants assert that immediately upon the Union's purported disclaimer of interest, the NBA's ongoing lockout, which is lawful under federal labor law, will suddenly be transformed into a violation of the antitrust laws, entitling Defendants to an injunction against the lockout and a claim for treble damages.

8.      The NBA disputes Defendants' assertions and requests a declaration that, whether or not any disclaimer of interest by the Union would be valid as a matter of labor law, the lockout is lawful and protected from antitrust attack by virtue of the labor exemption provided by Section 20 of the Clayton Act, 29 U.S.C. § 52 (as well as by Section 6 of the Clayton Act, 15 U.S.C. § 17, and the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*).

9.      The NBA also requests a declaration that the lockout is lawful and protected from antitrust attack by virtue of the non-statutory labor exemption. Because the NBPA's threatened disclaimer would not be a good faith, permanent relinquishment of the right to bargain with the NBA concerning the terms and conditions of the employment of NBA players and would not be effective as a matter of federal labor law, it has no effect on the continuing application and validity of the non-statutory labor exemption. Nor could the purported disclaimer have any effect on the validity of the lockout or the application of the non-statutory labor exemption for so

long as proceedings remain pending before the NLRB.  But even if, as a result of the proceedings now pending before the NLRB, the NBPA's purported disclaimer is not determined to be ineffective as a matter of federal labor law, the lockout would still not be "sufficiently distant in time and in circumstances from the collective-bargaining process," *Brown v. Pro Football, Inc.*, 518 U.S. 231, 250 (1996), and, accordingly, the non-statutory labor exemption would remain in effect.

10.    The NBA requests a further declaration that the lockout is lawful under the antitrust laws because it constitutes a reasonable, temporary bargaining measure designed to secure a new collective bargaining agreement, is ancillary to the legitimate purposes of the NBA's joint venture, and its procompetitive justifications therefore outweigh any alleged anticompetitive effects.

11.    The NBA also requests a declaration that, because the lockout involves or grows out of a labor dispute, the Norris-LaGuardia Act deprives the federal courts of jurisdiction to enjoin or restrain the lockout.  *See* 29 U.S.C. §§ 101 and 104.

12.    In the alternative, the NBA requests a declaration that, if the NBPA's disclaimer were not deemed invalid by the NLRB, and the collective bargaining relationship between the parties were not otherwise to continue, all existing contracts between NBA players and NBA teams (known as Uniform Player Contracts or "UPCs") would be void and unenforceable.  Because the terms of all UPCs are prescribed, governed and regulated by the CBA – which together with the UPCs comprehensively establish the terms and conditions of employment of all NBA players – the individual UPCs are the product of the collective bargaining process between the NBA and the NBPA, and, as a matter of federal labor law, are void upon the effective termination of that process.

## JURISDICTION

13.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1337, as an action arising under the Sherman and Clayton Acts (15 U.S.C. § 1 *et*

*seq.*); under the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq*; under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201-02; and under 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1391.

## PARTIES

15.     Plaintiff NBA is organized as a joint venture, with each of the 30 members

operating a professional basketball team in a particular geographic location in North America.

The NBA maintains its headquarters at 645 Fifth Avenue, New York, New York.

16.     The NBA member teams are owned and operated by the following entities:

Atlanta Hawks, LP (Atlanta Hawks); Banner Seventeen LLC (Boston Celtics); Bobcats

Basketball, LLC (Charlotte Bobcats); Chicago Professional Sports Limited Partnership (Chicago

Bulls); Cavaliers Operating Company, LLC (Cleveland Cavaliers); Dallas Basketball Limited

(Dallas Mavericks); The Denver Nuggets Limited Partnership (Denver Nuggets); Detroit Pistons

Basketball Company (Detroit Pistons); Golden State Warriors, LLC (Golden State Warriors);

Rocket Ball, Ltd. (Houston Rockets); Pacers Basketball LLC (Indiana Pacers); LAC Basketball

Club, Inc. (Los Angeles Clippers); The Los Angeles Lakers, Inc. (Los Angeles Lakers); Hoops,

L.P. (Memphis Grizzlies); Miami Heat Limited Partnership (Miami Heat); Milwaukee Bucks,

Inc. (Milwaukee Bucks); Minnesota Timberwolves Basketball Limited Partnership (Minnesota

Timberwolves); New Jersey Basketball, LLC (New Jersey Nets); New Orleans Hornets NBA

Limited Partnership (New Orleans Hornets); Madison Square Garden, L.P. (New York

Knickerbockers); The Professional Basketball Club, LLC (Oklahoma City Thunder); Orlando

Magic, Ltd. (Orlando Magic); Philadelphia 76ers, L.P. (Philadelphia 76ers); Suns Legacy

Partners, L.L.C. (Phoenix Suns); Trail Blazers, Inc. (Portland Trail Blazers); Sacramento Kings

Limited Partnership, LP (Sacramento Kings); San Antonio Spurs, L.L.C. (San Antonio Spurs);

Maple Leaf Sports & Entertainment Ltd. (Toronto Raptors); Jazz Basketball Investors, Inc. (Utah

Jazz); and Washington Bullets, L.P. (Washington Wizards).

17.     The NBPA, an unincorporated association, is a labor organization recognized by

the NBA and certified by the NLRB as the exclusive collective bargaining representative of all

NBA players.  The NBPA regularly represents employees employed in this judicial district for

purposes of collective bargaining, and maintains its headquarters at 310 Lenox Avenue, New

York, New York.

18.     With respect to the individuals named as defendants and class representatives:

(a)     Derek Fisher is a professional basketball player currently under contract

with the Los Angeles Lakers.  Fisher is the President of the NBPA.

(b)     Keyon Dooling is a professional basketball player currently under contract

with the Milwaukee Bucks.  Dooling is the First Vice President of the NBPA.

(c)     James Jones is a free agent professional basketball player who most

recently played professional basketball under a contract with the Miami Heat.  Jones is the

Secretary-Treasurer of the NBPA.

(d)     Matt Bonner is a professional basketball player currently under contract

with the San Antonio Spurs.  Bonner is a Vice President of the NBPA.

(e)     Maurice Evans is a professional basketball player currently under contract

with the Washington Wizards.  Evans is a Vice President of the NBPA.

(f)      Roger Mason, Jr. is a free agent professional basketball player who most recently played professional basketball under a contract with the New York Knickerbockers. Mason is a Vice President of the NBPA.  He resides in New York, New York.

(g)      Chris Paul is a professional basketball player currently under contract with the New Orleans Hornets.  Paul is a Vice President of the NBPA.

(h)      Theo Ratliff is a free agent professional basketball player who most recently played professional basketball under a contract with the Los Angeles Lakers.  Ratliff is a Vice President of the NBPA.

(i)      Etan Thomas is a free agent professional basketball player who most recently played professional basketball under a contract with the Atlanta Hawks.  Thomas is a Vice President of the NBPA.

(j)      Amar'e Stoudemire is a professional basketball player currently under contract with the New York Knickerbockers.  Stoudemire is the NBPA Player Representative for the Knickerbockers and resides in New York, New York.

(k)      Mike Dunleavy is a free agent professional basketball player who most recently played professional basketball under a contract with the Indiana Pacers.  Dunleavy resides in New York, New York.

(l)      James Fredette is a professional basketball player who was selected 10th overall in the 2011 NBA Draft by the Milwaukee Bucks, which subsequently traded Fredette's draft rights to the Sacramento Kings.  Fredette resides in Glen Falls, New York.

(m)      Charles Jenkins is a professional basketball player who was selected 44th overall in the 2011 NBA Draft by the Golden State Warriors.  Jenkins resides in Rosedale, New York.

## NATURE OF TRADE AND COMMERCE

19.     The NBA is engaged in, among other things, the public exhibition of professional

basketball games, an activity that includes a substantial volume of interstate activity.  The NBA's

interstate transactions collectively involve annual expenditures and receipts of many millions of

dollars.

20.     The NBA's business in interstate commerce includes the production and

marketing of NBA games in New York City.

## CLASS ACTION ALLEGATIONS

21.     This action is brought, in part, against a defendant class pursuant to Rules 23(a),

(b)(1) and (b)(2) of the Federal Rules of Civil Procedure.  The class consists of (a) all basketball

players who were, are or will be under contract to play professional basketball for an NBA team

during all or any portion of the period commencing on July 1, 2011 and ending on the date of a

final and unappealable judgment in this action; and (b) all other persons (including college and

other basketball athletes) who, during all or any portion of the period commencing on July 1,

2011 and ending on the date of a final and unappealable judgment in this action, were, are or will

be eligible to play basketball for an NBA team as a "Rookie" or "Veteran Player" (as those terms

are defined in the CBA).  The individual defendants described in paragraph 18 are the class

representatives.

22.     The class is so numerous and geographically widespread that joinder of all

members is impracticable.  At a minimum, the class consists of over 420 players.

23.     There are questions of law and fact common to the class, including the questions

of (a) whether the lockout of NBA players in support of the NBA's collective bargaining

position is lawful and protected from antitrust attack by virtue of Section 20 of the Clayton Act;

(b) whether the lockout of NBA players in support of the NBA's collective bargaining position is

lawful and protected from antitrust attack by virtue of the non-statutory exemption from the antitrust laws; (c) whether the lockout of NBA players constitutes only a temporary restraint, ancillary to the legitimate purposes of the NBA's joint venture, and has procompetitive justifications that outweigh any alleged anticompetitive effects; (d) whether this case involves or grows out of a labor dispute within the meaning of the Norris-LaGuardia Act, such that the federal courts are without jurisdiction to enjoin or restrain the lockout of NBA players; and (e) whether, assuming that the NBPA's purported disclaimer is not determined to be ineffective as a matter or federal labor law and the collective bargaining relationship between the parties does not otherwise continue, the UPCs are consequently void.

24.     The claims or defenses of the class representatives will be typical of the claims or defenses of the class.  These claims or defenses include the assertions that (a) the lockout of NBA players in support of the NBA's collective bargaining position is not exempt from antitrust attack by virtue of Section 20 of the Clayton Act; (b) because of the NBPA's purported disclaimer, the lockout of NBA players in support of the NBA's collective bargaining position is not exempt from antitrust attack by virtue of the non-statutory exemption from the antitrust laws; (c) absent the statutory and non-statutory exemptions from the antitrust laws, the lockout constitutes an unreasonable restraint of trade; (d) the Norris-LaGuardia Act does not prevent a federal court from enjoining the lockout, and that the lockout would violate the antitrust laws; and (e) notwithstanding the NBPA's purported disclaimer of interest, the UPCs remain valid and enforceable.

25.     The representative defendants will fairly and adequately protect the interests of the class they represent.

26.     Each player in the class is subject to the lockout that was commenced by the NBA on July 1, 2011.

27.     The prosecution of separate actions by or against individual members of the class would create the risk of (a) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the NBA; and (b) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of other class members not parties to the adjudications or substantially impair or impede the ability of such absent class members to protect their interests, thereby making declaratory relief with respect to the questions of law and fact identified above appropriate with respect to the class as a whole.

28.     By locking out NBA players, the NBA has acted or refused to act on grounds generally applicable to the class, thereby making declaratory relief with respect to the questions of law and fact identified above appropriate with respect to the class as a whole.

## ALLEGATIONS COMMON TO ALL CLAIMS

### The NBPA's History of Invoking Antitrust Laws and Disclaimer as a Collective Bargaining Tactic

29.     For over 40 years, the NBA has, as a multiemployer bargaining unit, engaged in collective bargaining with the NBPA over the terms and conditions of employment for NBA players. During this period, the parties have entered into 14 collective bargaining agreements of increasing length and complexity. In virtually every collective bargaining negotiation since 1970, the players have commenced or have threatened to commence antitrust litigation as a tactic to pressure the NBA to accede to the Union's bargaining demands. Not one of these litigations proceeded to a final adjudication, or even to trial. Indeed, despite the NBPA's repeated invocation of the antitrust laws in an effort to gain leverage in bargaining, the ultimate resolution

on each such occasion (i.e., in 1976, 1983, 1988, 1994, and 1999) has always been the same:  a collectively-bargained agreement between the NBA and the NBPA negotiated pursuant to federal labor law containing the very practices the NBPA had challenged as antitrust violations.

30.     As part and parcel of its pattern of improperly invoking the antitrust laws to further its collective bargaining goals, the NBPA also has repeatedly threatened either to "decertify" as a Union or "disclaim interest" as the players' representative in an attempt to avoid the labor exemption to the antitrust laws that indisputably applies during the course of the collective bargaining process.

31.     For example, in 1988, after the United States District Court for the District of New Jersey rejected the NBA players' argument that the non-statutory labor exemption to the antitrust laws ended immediately upon expiration of the parties' collective bargaining agreement (see Bridgeman v. NBA, 675 F. Supp. 960 (D.N.J. 1987)), the player representatives of the NBPA – represented then as they are represented now by attorney Jeffrey L. Kessler – purportedly voted to recommend to the players a decertification of the Union.  Notwithstanding that vote, the NBPA continued to bargain with the NBA, and the parties reached a new collective bargaining agreement (the "1988 CBA").

32.     After the expiration of the 1988 CBA in 1994, the parties engaged in collective bargaining for a successor agreement.  However, after just two bargaining sessions, the NBPA declared the existence of a bargaining impasse, refused to meet with the NBA and threatened an antitrust lawsuit.  In subsequent litigation, both this Court and the Second Circuit rejected the players' argument that the labor exemption to the antitrust laws ended at bargaining impasse, and found that the NBA's maintenance of employment terms beyond the expiration of the collective

bargaining agreement was protected from antitrust attack by virtue of the labor exemption. *See NBA v. Williams*, 45 F.3d 684 (2d Cir. 1995).

33.     Following the decision in the Second Circuit, the players once again turned to the tactic of decertification in an effort to enhance their leverage at the collective bargaining table. This time, and again represented by lawyer Jeffrey Kessler (who had earlier employed the same tactic on behalf of the National Football League Players Association ("NFLPA")), a group of prominent players (including then-NBPA President Patrick Ewing) filed a decertification petition with the NLRB in an attempt to derail a collective bargaining agreement that had been reached between the NBA and the Union.

34.     The proponents of the decertification stratagem, including both the players and their lawyers, made plain that the decertification effort was being used merely as a tactic to extract a more favorable collective bargaining agreement from the NBA.  Ultimately, when NBA players voted against decertification in a secret-ballot election conducted and supervised by the NLRB, the parties finalized a new collective bargaining agreement in 1995 (the "1995 CBA").

35.     In March 1998, the NBA exercised its right under the 1995 CBA to "reopen" that agreement effective as of June 30, 1998, and invited the NBPA promptly to commence negotiations for a successor agreement.  Those negotiations – which took place against the backdrop of repeated threats by the NBPA and NBA players to disclaim interest and bring antitrust claims – were unsuccessful.  Consequently, on or about July 1, 1998, the NBA commenced a lawful lockout of NBA players in support of its collective bargaining position. The lockout lasted until January 20, 1999, when the NBA and the Union reached an agreement on a successor collective bargaining agreement covering the period from January 20, 1999 through June 30, 2005 (the "1999 CBA").

36.     The NBA and the NBPA successfully negotiated a successor agreement to the 1999 CBA in the summer of 2005. That agreement – the most recently expired CBA – covered the time period from July 29, 2005 through June 30, 2011.

**The Current Dispute**

37.     Commencing in August 2009, the NBA and NBPA met on numerous occasions and attempted to negotiate a successor agreement to the 2005 CBA prior to its expiration on June 30, 2011. Despite the NBA's good faith efforts to negotiate a new collective bargaining agreement, however, on May 24, 2011, the NBPA filed with the NLRB an unfair labor practice charge against the NBA, which remains pending. When the 2005 CBA expired on June 30, 2011, the NBA exercised its federal labor law right, as part of the collective bargaining process, to impose a lockout of NBA players.

38.     In the weeks and months leading up to the expiration of the CBA, and continuing to date, the NBPA has made clear that it intended to pursue a course of action, fully consistent with its prior conduct, of (a) threatening and seeking to effectuate a purported disclaimer of its role as the players' exclusive collective bargaining representative; (b) threatening and filing antitrust litigation directed and financed by the NBPA and its lawyers; (c) having its executives and lawyers negotiate a new collective bargaining agreement with the NBA in settlement of the antitrust litigation; and (d) resurrecting the NBPA as a "union" representing all NBA players.

39.     In furtherance of this course of action, the Union already has collected from many NBA players forms purporting to authorize the Union to disclaim interest in its role as the players' exclusive bargaining representative at any time the Union itself sees fit to implement its disclaimer tactic and commence antitrust litigation. The collection of these authorization forms

demonstrates the Union's preparedness and intention to effectuate its threats of disclaimer and antitrust litigation.

40.     This is the very same tactic pursued by the NBPA's lawyer (Mr. Kessler) on two occasions on behalf of the NFLPA in its bargaining with the National Football League ("NFL"). The first such instance occurred in 1989, when the NFLPA purportedly disclaimed interest in collective bargaining and thereupon directed and financed an antitrust challenge to the terms and conditions of player employment. In support of that disclaimer, Mr. Kessler swore under oath that "the NFLPA's abandonment of collective bargaining rights was *permanent and irreversible*, and not designed to put pressure on the NFL to achieve a new collective bargaining agreement." Aff. of Jeffrey L. Kessler, *McNeil v. NFL*, No. 4-90-476 (Nov. 2, 1990) (emphasis in original). Yet, that very lawsuit was settled through negotiation of terms of a new collective bargaining agreement, after which the NFLPA resurrected itself as a union.

41.     Earlier this year, with the NFL and NFLPA facing the imminent expiration of their most recent collective bargaining agreement, the NFLPA again employed the identical disclaimer tactic, asserting in *Brady v. NFL* that it was (once again) permanently abandoning its role as the collective bargaining representative of NFL players. Yet this second purported disclaimer produced (entirely predictably) the very same result as its first purported disclaimer – a settlement of antitrust litigation brought by NFL players (again, directed and funded by the NFLPA) through the negotiation of a new collective bargaining agreement and the reconstitution of the NFLPA as a union representing all NFL players. In each instance, as here, the purported disclaimer had no purpose other than to create bargaining leverage by misusing the antitrust laws to secure a more favorable collective bargaining agreement.

42.     As the foregoing history shows, and the present dispute confirms, the past pattern by the NBPA of invoking the antitrust laws and threatening disclaimer, followed by the negotiation of new collective bargaining agreements, is designed for the sole purpose of (i) using antitrust litigation to secure a new collective bargaining agreement favorable to the players, and (ii) once that objective is achieved, to "resurrect" itself as a full-fledged "union" notwithstanding its prior "disclaimer." This history also makes clear that the sole purpose of the NBPA's disclaimer of interest is to enable the players to contend that there no longer exists a collective bargaining relationship between the NBA and the NBPA and that, accordingly – in their view – there is no bar to the NBA players' antitrust claims against the NBA, including their threatened antitrust attack on the ongoing lockout.

43.     In light of the NBPA's persistent abuse of the tactic of disclaimer and its threat to repeat it, as well as the disruptive effect this threat has had on the bargaining between the parties and the NBA's exercise of its labor law right to continue the lockout, the NBA is initiating a proceeding before the NLRB alleging, among other things, that:

(a)     the NBPA had engaged in an unfair labor practice by failing to bargain in good faith in an effort to reach a successor collective bargaining agreement, but rather engaging in a strategy calling for a sham disclaimer followed by antitrust litigation; and

(b)     any purported disclaimer by the NBPA would be invalid and ineffective under federal labor law.

44.     The NBA continues to exercise its federal labor law right to maintain the lockout despite threats of antitrust litigation and a disclaimer to facilitate such litigation. A purported disclaimer of interest by the NBPA and an antitrust challenge to the NBA's exercise of its federal labor law right to lock out NBA players are imminent.

**The Inextricable Relationship Between the CBA and the Uniform Player Contract**

45.     In reaction to the 1998 lockout, the NBPA initiated a grievance on behalf of more than 200 NBA Players who were parties to purportedly "fully guaranteed contracts for the 1998/1999 NBA Season," claiming, among other things, "[t]hat the NBA and its teams anticipatorily breached each of those contracts by advising the Players Association that the teams will not pay the salaries due under these guaranteed contracts during the NBA's 'lockout'" (the "Lockout Pay Grievance").

46.     On October 19, 1998, the Lockout Pay Grievance was denied in its entirety.  The Arbitrator who presided over the Lockout Pay Grievance (John Feerick) held "that the salary provisions of the Player Contracts are not effective or operative during a lawful lockout following the termination of the Collective Bargaining Agreement."  In reaching this conclusion, the Arbitrator stated that "it cannot be reasonably questioned that the UPCs signed by the Players involved in this proceeding are controlled by, dependent upon and closely intertwined with the CBA.  Indeed, a contract between a Player and a team has meaning only in relation to a system of contracts of many players and teams within a sport."  The Arbitrator further concluded that "[t]he CBA is the creator of the UPCs and governs them," and the fact that the UPCs specifically refer to and rely on a number of CBA provisions, reflects the "dominance of the CBA with respect to Player Contracts."

47.     Accordingly, in the event the NBPA's disclaimer were found not to be invalid, and the collective bargaining relationship between the parties were not otherwise to continue, the UPCs – which were the product of that collective bargaining relationship and are dependent on the continuation of that relationship – would be void and unenforceable as a matter of law.

## FIRST CLAIM FOR RELIEF

48.    The foregoing paragraphs are hereby incorporated as though fully set forth herein.

49.    Federal labor laws afford employers, including the members of a multiemployer bargaining unit, the right to lock out their employees.  The right to lock out is the employers' counterpart to the employees' right to strike.

50.    Regardless of the validity of any purported disclaimer by the Union, the imposition of a lockout of NBA players in support of the NBA's collective bargaining position is not a violation of the antitrust laws because such conduct is protected from antitrust attack by virtue of the labor exemption set forth in Section 20 of the Clayton Act.

51.    Defendants contend to the contrary.  There thus exists a substantial, present and justiciable controversy between the NBA and the Defendants concerning the antitrust legality of the NBA's ongoing lockout of NBA players in support of the NBA's collective bargaining position.

52.    By reason of the foregoing, the NBA is entitled to a declaration that its lockout of NBA players in support of its bargaining demands does not violate the antitrust laws.

## SECOND CLAIM FOR RELIEF

53.    The foregoing paragraphs are hereby incorporated as though fully set forth herein.

54.    Despite any purported disclaimer of interest, the NBPA is and will continue to be a labor organization within the meaning of the NLRA, with the purpose, in whole or in part, of dealing on a concerted basis with the NBA with respect to the terms and conditions of employment of NBA players.

55.    The lockout is being imposed by the NBA during, and as an integral part of, the collective bargaining process and as a lawful exercise of the NBA's federal labor law rights.

56.    The non-statutory labor exemption will continue to protect the lockout from antitrust scrutiny because, notwithstanding the NBPA's purported disclaimer, there will continue to be a collective bargaining relationship between the NBA and the NBPA.

57.    Even if the more than 40-year collective bargaining relationship between the NBA and the NBPA were no longer in place and even if it were unlikely to be revived, the non-statutory labor exemption would continue to protect the lockout from antitrust scrutiny unless and until there has been a "sufficient[] distan[ce] in time and in circumstances from the collective bargaining process [such] that a rule permitting antitrust intervention would not significantly interfere with that process," *Brown v. Pro-Football, Inc.*, 518 U.S. 231, 250 (1996) – and no such distance in time and circumstances from the collective bargaining process can be found to exist in this case.

58.    Further, where there is – as here – an unfair labor practice charge pending before the Board (which here includes the specific issue of the validity of any disclaimer by the NBPA), the non-statutory labor exemption will continue to apply "until final resolution of Board proceedings and appeals therefrom." *Powell v. NFL*, 930 F.2d 1293, 1303-04 (8th Cir. 1989).

59.    Notwithstanding any purported disclaimer of interest by the NBPA, the non-statutory labor exemption applies to the NBA's lockout and insulates that conduct from antitrust scrutiny.

60.    Defendants dispute the NBA's contentions set forth in paragraphs 54 through 59 and have threatened antitrust litigation against the lockout. There thus exists a substantial, present and justiciable controversy between the NBA and the Defendants concerning the antitrust legality of the NBA's ongoing lockout of NBA players in support of the NBA's collective bargaining position.

61.     By reason of the foregoing, the NBA is entitled to a declaration that its lockout of NBA players in support of its bargaining demands does not violate the antitrust laws.

### THIRD CLAIM FOR RELIEF

62.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

63.     Even if it is determined that Section 20 of the Clayton Act and the non-statutory exemption do not provide antitrust immunity for the ongoing lockout, the NBA contends that the lockout is not a violation of the antitrust laws because it constitutes a temporary bargaining measure designed to secure a new collective bargaining agreement, is ancillary to the legitimate purposes of the NBA's joint venture, and has procompetitive justifications that outweigh any alleged anticompetitive effects.

64.     Defendants contend to the contrary and have threatened antitrust litigation challenging the legality of the lockout.  There thus exists a substantial, present and justiciable controversy between the NBA and the Defendants concerning the antitrust legality of the NBA's ongoing lockout of NBA players in support of the NBA's collective bargaining position.

65.     By reason of the foregoing, the NBA is entitled to a declaration that its lockout of NBA players in support of its bargaining demands does not violate the antitrust laws.

### FOURTH CLAIM FOR RELIEF

66.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

67.     The lockout involves and grows out of a labor dispute.  The NBA imposed the lockout as part of a dispute with the NBA players over the terms and conditions of their employment.  The NBA and the players, including Defendants, are engaged in the same industry (professional basketball), and the dispute is between one or more employers or associations of employers (the NBA and the NBA teams) and one or more employees (the players).

68.     The lockout involves, among other things, the NBA ceasing or refusing to remain in any relation of employment with NBA players and withholding from NBA players, and persons seeking to become NBA players, moneys or things of value.  Therefore, federal courts lack jurisdiction to enjoin or restrain the ongoing lockout under the Norris-LaGuardia Act.

69.     Defendants dispute the NBA's contentions set forth in paragraphs 67 and 68. There thus exists a substantial, present and justiciable controversy between the NBA and the Defendants as to whether the Norris-LaGuardia Act deprives federal courts of jurisdiction to enjoin or restrain the lockout.

70.     By reason of the foregoing, the NBA is entitled to a declaration that the Norris-LaGuardia Act deprives the federal courts of jurisdiction to enjoin or restrain the lockout.

## FIFTH CLAIM FOR RELIEF

71.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

72.     Under the CBA, the NBA recognized the Union as the exclusive collective bargaining representative of NBA players; and pursuant to the National Labor Relations Act, 29 U.S.C. § 141 *et seq.*, the Union was certified as the exclusive collective bargaining representative of NBA players.

73.     As a consequence of such recognition and certification, Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), requires that all terms and conditions of employment of players employed by NBA teams be negotiated on a collective basis between the NBA and the Union, absent an express agreement between those parties authorizing individual negotiations.

74.     The NBA and the Union have, in numerous prior rounds of collective bargaining, repeatedly agreed to authorize individual negotiations between players and teams within the framework of the CBA and the UPC.  The UPCs are the product of these negotiations, and thus

of the collective bargaining process, and include employment terms agreed to by the NBA and Union during that process. Further, the UPCs refer to and incorporate numerous terms and conditions of player employment set forth in the CBA, and rely on the CBA to establish other terms and conditions of player employment that are not expressly set forth in the UPCs. Thus, as the arbitrator in the Lockout Pay Grievance determined, the UPCs are controlled by, dependent upon and closely intertwined with the CBA.

75.     Based upon the foregoing, if the Union's purported disclaimer of interest were ultimately not deemed invalid, and the collective bargaining relationship between the parties were not otherwise to continue, the UPCs would be void and unenforceable.

76.     Defendants contend to the contrary. There thus exists a substantial, present and justiciable controversy between the NBA and the Defendants as to whether the Union's purported disclaimer of interest and the termination of the parties' collective bargaining relationship render the UPCs void and unenforceable.

77.     By reason of the foregoing, the NBA is entitled to a declaration that if the Union's disclaimer is ultimately not deemed invalid, and the collective bargaining relationship between the parties does not otherwise continue, the UPCs would be void and unenforceable.

WHEREFORE, plaintiffs request the following relief:

(a)     on their first claim, judgment declaring that the NBA's ongoing lockout of NBA players in support of the NBA's collective bargaining position does not violate the antitrust laws without regard to the validity of any purported disclaimer by the NBPA because such conduct would be protected from antitrust attack by the labor exemption from the antitrust laws set forth in Section 20 of the Clayton Act;

(b)     on their second claim, judgment declaring that the ongoing lockout does not violate the antitrust laws without regard to any purported disclaimer by the NBPA because the NBPA's purported disclaimer of interest is insufficient to terminate the non-statutory exemption to the antitrust laws;

(c)     on their third claim, judgment declaring that the ongoing lockout does not violate the antitrust laws without regard to any purported disclaimer by the NBPA because such conduct would constitute a temporary bargaining measure, is ancillary to the legitimate purposes of the NBA's joint venture, and has procompetitive justifications that outweigh any alleged anticompetitive effects;

(d)     on their fourth claim, judgment declaring that the Norris-LaGuardia Act deprives the federal courts of jurisdiction to enjoin or restrain the ongoing lockout without regard to any purported disclaimer by the NBPA;

(e)     on their fifth claim, judgment declaring that if the NBPA's disclaimer were not found to be invalid and unlawful under federal labor law, and the collective bargaining relationship between the parties were not otherwise to continue, the UPCs would be void and unenforceable;

(f)     an order determining that the claims alleged herein may be maintained as a defendant class action under rule 23(a), (b)(1)(A), (b)(1)(B), and/or (b)(2) of the Federal Rules of Civil Procedure and certifying the Class as defined above; and

    (g)    such other and further relief as the Court shall deem proper.

Dated:    New York, New York
           August 2, 2011


Howard L. Ganz (HG 8644)
Howard Z. Robbins (HR 8815)
**PROSKAUER ROSE LLP**
11 Times Square
New York, New York  10036
Telephone:  (212) 969-3035
Facsimile:  (212) 969-2900
hganz@proskauer.com
hrobbins@proskauer.com


Jeffrey A. Mishkin (JM 8380)
Anthony J. Dreyer (AD 3571)
**SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP**
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
jeffrey.mishkin@skadden.com
anthony.dreyer@skadden.com


Richard W. Buchanan (RB 9019)
**NATIONAL BASKETBALL
ASSOCIATION**
645 Fifth Avenue
New York, New York  10022
Telephone:  (212) 407-8000
Facsimile:  (212) 888-7931
rbuchanan@nba.com


Of Counsel:  Paul D. Clement
**BANCROFT PLLC**
1919 M Street, N.W., Suite 470
Washington, D.C.  20036
Telephone:  (202) 234-0090
Facsimile:  (202) 234-2806
pclement@bancroftpllc.com


*Attorneys for Plaintiffs*